

**FILED**
U.S. DISTRICT COURT
EASTERN DISTRICT ARKANSAS

## UNITED STATES DISTRICT COURT
### EASTERN DISTRICT OF ARKANSAS
### NORTHERN DIVISION

APR 0 6 2023

TAMMY H. DOWNS, CLERK

By:_____
                              **DEP CLERK**

BILL WALMSLEY; JON MOSS; IOWA
HORSEMEN'S BENEVOLENT AND
PROTECTIVE ASSOCIATION,

      Plaintiffs,

    v.

FEDERAL TRADE COMMISSION;
LINA M. KHAN, Chair of the FTC;
REBECCA KELLY SLAUGHTER,
Commissioner of the FTC; CHRISTINE
S. WILSON, Commissioner of the FTC;
ALVARO BEDOYA, Commissioner of
the FTC; HORSERACING
INTEGRITY AND SAFETY
AUTHORITY; CHARLES SCHEELER;
STEVE BESHEAR; ADOLPHO
BIRCH; LEONARD COLEMAN;
JOSEPH DE FRANCIS; ELLEN
MCCLAIN; SUSAN STOVER; BILL
THOMASON; D.G. VAN CLIEF;

      Defendants.

Case No. ___3:23-cv-81-JM___

This case assigned to District Judge __Moody__
and to Magistrate Judge __Volpe__

## COMPLAINT FOR
## INJUNCTIVE AND DECLARATORY RELIEF

Bill Walmsley loves horses. From his home nestled in the Arkansan Ozarks, Mr. Walmsley

spends much of his days thinking about all things equine. The 81-year-old Mr. Walmsley dedicated

his life to public service—as both a state legislator and a state appellate judge. Now retired, Mr.

Walmsley enjoys watching his horses do what they love most: Run.

But Mr. Walmsley's retirement is no idle affair. To the contrary, Mr. Walmsley leads the

Arkansas chapter of the National Horsemen's Benevolent and Protective Association (HBPA), a

group dedicated to providing housing, meals, and other services to employees in the horse industry.

When Arkansas horsemen are in need, Bill Walmsley lends a hand.

1

Hundreds of miles away in Iowa, Jon Moss takes up the mantle for horsemen at the Iowa HBPA. And Mr. Moss knows horses—day in, day out, he works with jockeys, veterinarians, trainers, and owners to improve Hawkeye State racing. The Iowa HBPA chapter comprises members from all walks of life. Jon Moss makes sure they all get a fair shake.

Both Mr. Walmsley and Mr. Moss understand the hardship and struggle that comes with the horse business. They've lived it. Competition is fierce. Costs are high. Pay is not always great. And nothing ever comes easy. But like all horsemen, Mr. Walmsley and Mr. Moss follow a time-honored tradition: In this industry, horsemen take care of their own.

Yet America's centuries-old relationship with horses and horseracing has been set ablaze. Under the Horseracing Integrity and Safety Act of 2020 (the "Horse Act") longstanding legal principles have fallen by the wayside. No longer will states govern horseracing (as they have for more than a century). Instead, the Horse Act has created a brand-new entity—a private nonprofit corporation known as the Horseracing Integrity and Safety Authority (the "Authority")—that wields absolute power over all horseraces from coast to coast.

The Authority creates, enforces, and adjudicates horseracing rules—with hardly any limit. Consider just a few examples: Under the Horse Act, the Authority picks what substances horses may ingest. It says when—and how much—medication horses may take. A horse's diet? That's up to the Authority. It also sets racetrack safety standards, governs horseshoes, limits a jockey's ability to steer and control the horse, and requires everyone subject to the Act to register and pay fees. Any noncompliance comes with a lawsuit—filed by the Authority itself. And—to top it off—its own internal court system decides who wins.

The Authority's rules have the force of law. They preempt all conflicting state laws. Some violations of the Act are strict liability—even for the slightest hint of a banned substance (as

2

determined by the Authority). And sanctions can top $100,000. In short, a private, unelected, and unaccountable body controls a legendary and iconic American industry.

Horsemen like Mr. Walmsley and Mr. Moss deserve better. For more than 100 years, the calloused hands of rank-and-file men and women in the horse industry have built horseracing into a national pastime. But small tracks and owners across the country now face arbitrary rules and stringent rules issued by their larger competitors.

Even worse, the Horse Act barely pretends to comply with the Constitution's separation of powers. The Act allows a private corporation to issue binding rules with no guiding principle. The Federal Trade Commission's ostensible oversight serves as a mere mirage. The Horse Act *requires* the FTC to approve the Authority's rules. FTC Commissioners can't initiate their own rulemaking or oversee the Authority's enforcement actions or appoint and remove Board members or control the Authority's funding. Instead, Board members are picked by the Authority itself, and only a unanimous vote of the Board can result in a different Board member's removal. Industry members on the Board regulate their (smaller) competitors. Fines levied by the Authority are used to fund the Authority's activities. And many of the Authority's internal lawsuits are insulated from meaningful judicial review. The Authority, in other words, is a law unto itself.

Our Constitution does not permit unaccountable private actors to wield such power. The Constitution vests all government authority in the legislative, executive, and judicial branches. And by outsourcing these powers to a private corporation, the Horse Act tramples our constitutional structure. This Court should declare the Horse Act unconstitutional and preliminarily and permanently enjoin Defendants from enforcing the law and the rules and regulations promulgated under the Act.

## JURISDICTION AND VENUE

1.      This action arises under the Constitution and laws of the United States, so this Court has federal-question jurisdiction under Article III of the Constitution and 28 U.S.C. § 1331.

2.      This Court also has jurisdiction under the Administrative Procedure Act. 5 U.S.C. §§ 701–706. Jurisdiction is further proper under 28 U.S.C. §§ 1337, 1346, 1651, and 2201.

3.      Venue is proper in this district pursuant to 28 U.S.C. § 1391(b) and (e) because Defendants include United States agencies or officers sued in their official capacities. Plaintiff Mr. Walmsley resides in this judicial district, and a substantial part of the events or omissions giving rise to his claims occurred in this judicial district.

## THE PARTIES

4.      Plaintiff Bill Walmsley is an individual residing in the Eastern District of Arkansas who is a "covered person" under the Horse Act.

5.      Plaintiff Jon Moss is an individual residing in Iowa who is a "covered person" under the Horse Act.

6.      Plaintiff Iowa Horsemen's Benevolent and Protective Association (Iowa HBPA) is an organization comprising 924 horsemen in Iowa. Its members include owners and trainers subject to the Horse Act. Iowa HBPA members engage in horseracing activity in Iowa, Arkansas, and other states.

7.      Defendant Federal Trade Commission is an executive agency of the United States.

8.      Defendant Lina M. Khan is a Commissioner and Chair of the FTC and is sued in her official capacity.

9.      Defendant Alvaro Bedoya is a Commissioner of the FTC and is sued in his official capacity.

10.     Defendant Rebecca Kelly Slaughter is a Commissioner of the FTC and is sued in her official capacity.

11.     Defendant Christine S. Wilson is a Commissioner of the FTC and is sued in her official capacity.

12.     Defendant Horseracing Integrity and Safety Authority (the "Authority") is a nonprofit corporation. The Authority purports to be a nonprofit Delaware corporation with its principal place of business in Lexington, Kentucky.

13.     Defendant Charles Scheeler is an independent director and the Chair of the Board of Directors of the Horseracing Integrity and Safety Authority.

14.     Defendant Steve Beshear is an independent director and the Vice Chair of the Board of Directors of the Horseracing Integrity and Safety Authority.

15.     Defendant Adolpho Birch is an independent director of the Board of Directors of the Horseracing Integrity and Safety Authority. Mr. Birch is also the Chair of the Authority's Anti-Doping and Medication Control Standing Committee.

16.     Defendant Leonard Coleman is an independent director of the Board of Directors of the Horseracing Integrity and Safety Authority.

17.     Defendant Ellen McClain is an independent director of the Board of Directors of the Horseracing Integrity and Safety Authority.

18.     Defendant Bill Thomason is an industry director of the Board of Directors of the Horseracing Integrity and Safety Authority.

19.     Defendant Joseph De Francis is an industry director of the Board of Directors of the Horseracing Integrity and Safety Authority.

20.     Defendant Susan Stover is an industry director of the Board of Directors of the Horseracing Integrity and Safety Authority. Ms. Stover is also the Chair of the Authority's Racetrack Safety Standing Committee.

21.     Defendant D.G. Van Clief is an industry director of the Board of Directors of the Horseracing Integrity and Safety Authority.

## BACKGROUND

### The Plaintiffs: America's Horsemen

22.     From his home in Batesville, Arkansas, Bill Walmsley devotes much of his time with his horses.

23.     Mr. Walmsley spent his life in public service—as a former state senator and court of appeals judge—and now retired, he thinks mostly of his first love: all things equestrian.

24.     Mr. Walmsley has, for decades, worked with mares, fillies, geldings, thoroughbreds, stallions, and everything in between. He's scrubbed hooves, brushed coats, saddled up, and cleaned out stables. Mr. Walmsley, in short, knows a good horse when he sees one.

25.     Today, Mr. Walmsley holds an ownership interest in three horses that he enters into racing events at Arkansas's lone racetrack, Oaklawn Racing in Hot Springs, Arkansas.

26.     His horses have raced this year at Oaklawn and are scheduled to race in future events during the racing season through May.

27.     As a horse owner licensed by the state of Arkansas, Mr. Walmsley must—under the dictates of the Horse Act—register with the Horseracing Integrity and Safety Authority. He must also comply with the Authority's rules and regulations. Those rules impose stringent restrictions on Mr. Walmsley—including requiring him to open his books and records to any search without reasonable suspicion and to provide his horses for testing whenever the Authority decides.

28.     Mr. Walmsley also leads the Arkansas chapter of the National Horsemen's Benevolent and Protective Association, a group dedicated to providing housing, meals, and other services to employees in the horse industry.

29.     Jon Moss shares a similar love for all things equine. His life has revolved around the racing industry for decades.

30.     Mr. Moss leads the Iowa Horsemen's Benevolent Protective Association, a group dedicated to providing healthcare, fair pay, and other benefits to racetrack workers.

31.     Mr. Moss is licensed in the State of Iowa.

32.     As a "covered person" under the Horse Act, Mr. Moss must also comply with the Authority's regulations, register as a covered person.

33.     The Iowa HBPA represents hundreds of horsemen in Iowa, all of whom are covered persons under the Horse Act, subjecting them to registration and complying with the Authority's rules.

34.     The HBPA grew out of a tradition of America's horsemen taking care of their own. The HBPA provides medical care, burial services, food, houses, and more for workers and family members in the horseracing industry.

35.     Congress passed the Horseracing Integrity and Safety Act in 2020, which put expansive powers into the hands of private individuals to regulate all aspects of the horseracing industry.

36.     Mr. Walmsley, Mr. Moss, and the HBPA are now subject to an extensive regulatory scheme and are forced to pay fees, comply with the Authority's rules, submit to warrantless searches, and hand over samples to the Authority—all causing here-and-now harm. *Contender Farms, L.L.P. v. U.S. Dep't of Agric.*, 779 F.3d 258, 266 (5th Cir. 2015) ("An increased regulatory

burden typically satisfies the injury in fact requirement."); *Ass'n of Am. R.R.s v. Dep't of Transp.*, 38 F.3d 582, 586 (D.C. Cir. 1994) (The "additional regulatory burden imposed upon [plaintiffs] as the result of a federal agency's unlawful adoption of a rule" causes harm).

### *The Horse Act*

37.     For more than 125 years, states have exclusively regulated the horseracing industry.

38.     Congress passed the Horse Act on December 27, 2020, as part of the Consolidated Appropriations Act, Pub. L. No. 116-260, 134 Stat. 1182 (2020). The Act creates a private, nonprofit corporation called the Horseracing Integrity and Safety Authority that wields substantial power over all elements of the horseracing industry.

39.     The Horse Act establishes the Authority as a "private, independent, self-regulatory, nonprofit corporation," tasked with "developing and implementing a horseracing anti-doping and medication control program and a racetrack safety program." 15 U.S.C. § 3052(a).

40.     The Authority consists of nine members—five "independent" members, and four "industry" members—who wield substantial power regulating the industry. 15 U.S.C. § 3052(b).

41.     The five independent members are "selected from outside the equine industry." 15 U.S.C. § 3052(b)(1)(A). The industry members "shall be . . . selected from among the various equine constituencies." *Id.* § 3052(b)(1)(B)(i).

42.     Vacancies on the Board are filled by the Authority's bylaws, which provide "the procedures for filling vacancies on the Board," establish "term limits for members and termination of membership," and address "any other matter the Board considers necessary." 15 U.S.C. § 3052(b)(3).

43.     The Authority's incorporation documents—and it is incorporated under the laws of Delaware—create a Nominating Committee "comprised of seven independent members selected

8

from business, sports, and academia" that picks the board members. 15 U.S.C. § 3052(d)(3). Vacancies in the nominating committee "shall be filled by the Board pursuant to rules established by the Authority." *Id.* § 3052(d)(1)(C).

44. And board members may be removed only "for cause" on a unanimous vote of all other members. *See* Bylaws, Section 3.3, *available at* https://static1.squarespace.com/static/604f6ab712afe14e11227976/t/621e907e0da83f42eae4b020 /1646170238810/HISA+Bylaws.pdf.

45. Directors are not subject to control by the FTC or any other governmental official.

46. No government entity, agency, official, or employee—not the President, not the FTC—has any authority to approve or reject any member of the board of directors or the nominating committee.

47. No government entity, agency, official, or employee—including the President or FTC—has any authority to remove from office any member of the board of directors or the nominating committee.

48. On May 5, 2021, the nominating committee selected the following individuals to the Board of Directors: Steve Beshear, Leonard Coleman, Ellen McClain, Charles Scheeler, and Adolpho Birch as independent directors. It named Joseph De Francis, Susan Stover, Bill Thomason, and D.G. Van Clief as industry directors.

49. The Authority also includes both an "anti-doping and medication control standing committee" and a "racetrack safety standing committee," which "provide advice and guidance to the Board on the development and maintenance of" the anti-doping program and racetrack safety program. 15 U.S.C. § 3052(c).

50.     The Authority possesses power to regulate breeders, horses, races, trainers, veterinarians, jockeys, and any person "engaged in the care, training, or racing of covered horses." 15 U.S.C. § 3051(6).

51.     The Horse Act defines "covered horse" to mean "any Thoroughbred horse, or any other horse made subject to this chapter by election of the applicable State racing commission or the breed governing organization for such horse under section 3054(k) [1] of this title, during the period beginning on the date of the horse's first timed and reported workout at a racetrack that participates in covered horseraces or at a training facility; and ending on the date on which the Authority receives written notice that the horse has been retired." 15 U.S.C. § 3051(4)(A)–(B).

52.     The Horse Act defines "covered horserace" as any horserace involving covered horses that has a substantial relation to interstate commerce, including any Thoroughbred horserace that is the subject of interstate off-track or advance deposit wagers." 15 U.S.C. § 3051(5).

53.     The Horse Act defines "covered persons" as "all trainers, owners, breeders, jockeys, racetracks, veterinarians, persons (legal and natural) licensed by a State racing commission and the agents, assigns, and employees of such persons and other horse support personnel who are engaged in the care, training, or racing of covered horses." 15 U.S.C. § 3051(6).

54.     Among the Authority's powers, it:

   a.   Issues legislative rules for laboratory standards; racing surface quality maintenance; racetrack safety standards and protocols; safety; performance, anti-doping, and medication control violations; civil sanctions; and procedures for discipline under the Act. 15 U.S.C. § 3053(a).

   b.   "[E]xercise[s] independent and exclusive national authority over the safety, welfare and integrity" of covered people and horses. *Id.* § 3054(a)(2)(A).

10

c.   Exercises exclusive control over "all horseracing safety, performance, and anti-doping and medication control matters" for covered people and horses. *Id.* § 3054(a)(2)(B).

d.   Develops rules addressing "access to offices, racetrack facilities, other places of business, books, records, and personal property of" individuals subject to the Act. *Id.* § 3054(c)(1)(A)(i).

e.   Issues and enforces subpoenas and holds investigatory authority for civil violations. *Id.* § 3054(c)(1)(a)(ii), (h).

f.   Investigates to the same extent state racing commissions have investigatory power. *Id.* § 3054(c)(1)(a)(iii)

g.   Requires all "covered persons" under the Act to register with the Authority. *Id.* § 3054(d)(1).

h.   Oversees the anti-doping and medication control enforcement organization, which enforces rules "*on behalf of* the Authority." *Id.* § 3054(e)(1)(E).

i.   Issues "guidance" that interprets existing rules or procedures or states the policy or practice with respect to enforcement of any rule. *Id.* § 3054(g).

j.   Develops a "list of civil penalties" that applies to covered persons. *Id.* § 3054(i).

k.   May file civil lawsuits in federal court to "enjoin" any "acts or practices" that "constitut[e] a violation of this chapter or any rule established under this chapter." *Id.* § 3054(j)(1)–(2).

l.   May file civil lawsuits in federal court "to enforce any civil sanctions imposed under that section and for all other relief to which the Authority may be entitled." *Id.* § 3054(j)(1).

m.  Establishes a "horseracing anti-doping and medication control program" *Id.* § 3055(a)(1). The program includes "uniform standards" for the "administration of medication of" horses and a "list of permitted and prohibited medications, substances, and methods." *Id.* § 3055(c)(1).

n.  Establishes a "racetrack safety program" for all horses, persons and races covered by the act. *Id.* § 3056(a)(1). The safety program must include "training and safety standards," a "racing surface quality maintenance system," "track safety standards," a program for "investigations at racetrack and non-racetrack facilities," "[p]rocedures for investigating, charging, and adjudicating violations," "enforcement of civil sanctions for violations," and establishing disciplinary hearings. *Id.* § 3056(b).

o.  Issues rules for "safety and performance standards of accreditation for racetracks." *Id.* § 3056(c)(2)(A).

p.  May "require covered persons to collect and submit" information to a nationwide database regarding racehorse safety. Id. § 3056(c)(3).

q.  Issues a description of safety and anti-doping rule violations. *Id.* § 3057(a)(1).

r.  Creates the elements of offenses for rule violations. *Id.* § 3057(a)(2).

s.  Establishes the disciplinary process—including hearing procedures, standards for burden of proof, presumptions, evidentiary rules, and appeals—for safety, performance, and anti-doping and medication control rule violations. *Id.* § 3057(c).

t.   Create civil sanctions, including lifetime bans from horseracing, disgorgement of purses, monetary fines and penalties, and changes to race results. *Id.* § 3057(d).

55.   Authority rules and regulations even preempt all state law—the traditional mode of regulating horseracing for more than 100 years. 15 U.S.C. § 3054(b).

56.   As originally written, the Act strictly limited the FTC's role, with no substantive review powers at all.

57.   The Act was amended slightly in 2022, but even now, the FTC *must* approve all Authority rules. Under 15 U.S.C. § 3053(c)(2), "The Commission shall approve a proposed rule if the Commission finds that the proposed rule is consistent with" the Act and the applicable rules approved by the Commission.

58.   The Commission itself admits that the statute "does not allow the Commission to modify a proposed rule" from the Authority. *See* FTC, *Order Approving the Anti-Doping and Medication Control Rule Proposed by the Horseracing Integrity and Safety Authority* at 1, n.2 (March 27, 2023), *available at* https://www.ftc.gov/system/files/ftc_gov/pdf/P222100CommissionOrderAntiDopingMedication.pdf.

59.   The Horse Act allows the Authority to obtain loans as an initial source of funding. 15 U.S.C. § 3052(f)(1)(A).

60.   The Authority may also "borrow funds toward the funding of its operations." 15 U.S.C. § 3052(f)(1)(B).

13

61. Each November 1, on an annual basis, the Authority must "determine and provide to each State racing commission the estimate amount required from the State." 15 U.S.C. § 3052(f)(1)(C)(i).

62. The Authority also receives funds via the states and fees that the Authority imposes.

### *The Horseracing Integrity and Safety Authority's Regulations*

63. In keeping with the Horse Act's statutory mandate, the Authority has promulgated regulations over the horseracing industry.

64. The Authority began issuing regulations in early 2022, starting with the so-called Racetrack Safety Plan as contemplated by the Horse Act. *See* 15 U.S.C. § 3056(a); 87 Fed. Reg. 435 (Jan. 5, 2022).

65. Those rules covered a wide range of issues, including racetrack accreditation, racetrack surface safety, treatments, restrictions, and more.

66. Later in January 2022, the Authority issued Enforcement Rules that established "civil sanctions, procedures for disciplinary and accreditation hearings, and provisions concerning the exercise of investigatory powers by the Authority." *See* 87 Fed. Reg. 4023,4024 (Jan. 26, 2022).

67. In July 2022, the Enforcement Rules were modified. *See* 87 Fed. Reg. 44,399 (July 26, 2022).

68. A month later, the Authority issued additional rules—this time establishing a methodology for determining assessments for violations of the Horse Act. 87 Fed. Reg. 9349 (Feb. 18, 2022).

69. Those rules explained how, among other things, to remit fees to the Authority and how each racetrack shall submit its allocation of assessments from covered persons under the Act.

14

70.     In May 2022, the Authority promulgated Registration Rules. 87 Fed. Reg. 29,862 (May 17, 2022).

71.     The Registration Rules required all Covered Persons to "register with the Authority and provide and update the information specified in the proposed rule." *Id.* at 29,863. The Rules also "require[] Covered Persons to agree to comply with all rules, standards, and procedures developed and approved under 15 U.S.C. 3054(c)." The Rules further require registration of Covered Horses.

72.     The Federal Trade Commission approved all of these proposed rules from the Authority as comporting with procedural requirements under the Act. *See* FTC Orders: https://www.ftc.gov/system/files/ftc_gov/pdf/order_re_racetrack_safety_2022-3-3_for_publication.pdf (Racetrack Safety, Mar. 3, 2022); https://perma.cc/H9SJ-F9WA (Enforcement, March 25, 2023); https://www.ftc.gov/system/files/ftc_gov/pdf/Order%20re%20HISA%20Enforcement%20Rule%20Modification.pdf (Enforcement Modification, Sept. 23, 2022); https://www.ftc.gov/system/files/ftc_gov/pdf/Order%20re%20HISA%20Assessment%20Methodology.pdf (Assessment Methodology, April 1, 2022); https://www.ftc.gov/system/files/ftc_gov/pdf/P222100CommissionOrderRegistrationRuleFinal.pdf (Registration, June 29, 2022).

73.     In October 2022, the Authority promulgated Anti-Doping and Medication Control rules. *See* 87 Fed. Reg. 65,292 (Oct. 28, 2022).

74.     However, the United States Court of Appeals for the Fifth Circuit struck down the Horse Act as violating the private nondelegation doctrine in November 2022. *See Nat'l Horsemen's Benevolent and Protective Ass'n v. Black*, 53 F.4th 869 (5th Cir. 2022).

15

75.     After the Fifth Circuit's ruling, the FTC disapproved the Authority's Anti-Doping rules. *See* FTC, *Order Disapproving the Anti-Doping and Medication Control Rule Proposed by the Horseracing Integrity and Safety Authority, available at* https://www.ftc.gov/system/files/ftc_gov/pdf/order_re_hisa_anti-doping_disapprove_without_prejudice_0.pdf (Dec. 12, 2022).

76.     The Commission stated that approval of the rule "would not result in uniformity because the Horseracing Integrity and Safety Act has been held unconstitutional by" the Fifth Circuit and "[i]f that decision remains undisturbed, the proposed rule may be unenforceable in the States that are the plaintiffs in the Fifth Circuit action and in other States within the Fifth Circuit." *Id.* at 2.

77.     At the end of 2022, Congress passed the Consolidated Appropriations Act, 2023, H.R. 2617, 117th Cong. (2022)—the "Omnibus Bill"—which amended 15 U.S.C. § 3053(e) to ostensibly address constitutional problem identified in the Fifth Circuit's opinion.

78.     Specifically, the new § 3053(e) states:

> The Commission, by rule in accordance with section 553 of title 5, United States Code, may abrogate, add to, or modify the rules of the Authority promulgated in accordance with this Act as the Commission finds necessary or appropriate to ensure the fair administration of the Authority, to conform the rules of the Authority to requirements of this Act and applicable rules approved by the Commission, or otherwise in furtherance of the purposes of this Act.

79.     Notably, the amendment did not alter § 3053(c), or its requirement that the FTC "shall" approve Authority rules so long as they comport with procedural requirements.

80.     After Congress passed the Omnibus Bill altering the statutory language, the FTC reaffirmed and ratified all prior Authority rules that had been promulgated, making few changes. *See* Federal Trade Comm'n, *Order Ratifying Previous Commission Orders as to Horseracing Integrity and Safety Rules, available at*

16

https://www.ftc.gov/system/files/ftc_gov/pdf/HISA%20Order%20re%20Ratification%20of%20P revious%20Orders%20-%20Final%20not%20signed.pdf (Jan. 3, 2023).

81.     As of January 2023, then, the Authority's rules regarding (1) racetrack safety, (2) enforcement, (3) assessment penalties, and (4) registration, remain in effect.

82.     On January 26, 2023, the Authority reissued the Anti-Doping and Medication Control Rules. *See* 88 Fed. Reg. 5070 (Jan. 26, 2023).

83.     On March 27, 2023, the FTC approved the Anti-Doping and Medication Control Rules. *See* FTC, *Order Approving Anti-Doping and Medication Control Rule*, ("Anti-Doping Order")     (March     27,     2023),     *available     at*, https://www.ftc.gov/system/files/ftc_gov/pdf/P222100CommissionOrderAntiDopingMedication. pdf.

84.     In that Order, the FTC confirmed that despite the congressional amendment to the statute, it still possessed no discretion to change, reject, or modify a proposed rule from the Authority. *See* Order at 1, n.2.

85.     Instead, the FTC can only change *existing* rules "in furtherance of the purposes of the Act." *Id.*

86.     Regulations regarding registration of covered persons and covered horses require registration of all covered persons through the Authority's website. 87 Fed. Reg. 29,866.

87.     The regulations give the Authority investigatory powers. Under Rule 8400, the Authority has "free access to" "books, records, offices, racetrack facilities, and other places of business of Covered Persons that relate to the care, treatment, training and racing of Covered Horses." 87 Fed. Reg. at 44,404 (Rule 8400(a)(1)(i)); *see also* Rule 3133 (b)(1); 5730(b)(1) (granting same authority under Anti-Doping rule).

88.     The Authority may also "seize any medication, drug, substance, or paraphernalia in violation or suspected violation of" the Horse Act "or the regulations of the Authority, and any object or device reasonably believed to have been used in furtherance of the violation or suspected violation." *Id.* (Rule 8400(a)(2)); *see also* Rule 5730(b)(2) (granting same authority under Anti-Doping rule).

89.     A covered person must "[c]ooperate with . . . the Authority" and respond truthfully about a racing matter. *Id.* (Rule 8400(c)). The Authority may also "issue subpoenas for the attendance of witnesses" and "for the production of documents, records, papers, books, supplies, devise, equipment, and all other instrumentalities." *Id.* (Rule 8400(e)); *see also* Rule 3133(b)(2)–(3); 5730 (Anti-Doping rule granting subpoena and investigatory power).

90.     Other regulations lay out violations, sanctions, hearing procedures and investigatory powers. 87 Fed. Reg. 44,399 (July 26, 2022). Violations include failure to cooperate with the Authority, failure to respond truthfully to the Authority, failure to comply with a ruling of the Authority, failure to register with the Authority, and failure to remit fees to the Authority, among many others. *Id.* at 44,400. A covered person can be sanctioned for "any violation of, or failure to comply with" the Authority's regulations. *Id.* And sanctions are imposed after a "hearing required to be conducted in accordance" with Authority rules. *Id.* The Authority or Authority-picked adjudicators may impose sanctions "in proportion to the nature, chronicity, and severity of the violation." *Id.* Depending on the rule violation, sanctions include monetary fines of up to $100,000 and a lifetime ban from the industry. *Id.*

91.     The Authority has created adjudication procedures for violations. Depending on the violation, the Authority may "at its discretion" refer the case for adjudication to: (1) the National

Stewards Panel, (2) an independent Arbitral Body, (3) the stewards, or (4) conduct a hearing itself. 87 Fed. Reg. 44,401 (Rule 8330).

92.     After the Authority renders its final decision, a party may file for review by an administrative law judge. 15 U.S.C. § 3058(b).

93.     After the ALJ's decision, a party may seek review by the Federal Trade Commission, or Commissioners may institute review themselves. *Id.* § 3058(c)(1), (2). The Commission has discretion to accept a request for review or reject it. *Id.* § 3058(c). If the Commission accepts review, its decision becomes final, but if it declines to hear the case, the ALJ's ruling "shall constitute the decision of the Commission." *Id.* § 3058(b)(3)(B).

94.     Neither the Horse Act nor the Authority's regulations provide for judicial review of final orders.

### *The Anti-Doping and Medication Control Rules*

95.     The Authority's latest rules relate to Anti-Doping and Medication Control. They went into effect March 27, 2023.

96.     The new rules will affect ongoing horseracing in Arkansas by subjecting horsemen and participants to brand new rules in the middle of a racing season. On March 26—the day before the rules had become final—state law governed horseracing rules.

97.     On March 31, a federal district court in Texas enjoined enforcement of the anti-doping rules until May 1.

98.     Horsemen in Arkansas—including Walmsley and Iowa HBPA members who engage in horseracing in Arkansas and other states—will be harmed by the rules and regulations if they are not enjoined or vacated.

19

99. The new rules will also affect racing in Iowa which begins on May 12. Training for races in Iowa begins April 14.

100. Horsemen in Iowa—including Iowa HBPA members—will be harmed by the rules and regulations if they are not enjoined or vacated.

101. The Anti-Doping and Medication Rules: "(1) set forth a list of anti-doping and controlled medication rules; (2) set forth a list of prohibited substances and methods; (3) set forth a framework for the testing of covered horses and the investigation of possible rule violations by the [Authority]; (4) set forth a framework by which laboratories will be accredited and will analyze samples for prohibited substances and markers of prohibited methods; (5) specify the civil sanctions that apply to anti-doping and controlled medication violations; (6) create procedures for disciplinary hearings, tailored to the nature of the charge." 88 Fed. Reg. 5070 (Jan 26, 2023).

102. Under the Anti-Doping program, covered entities will be subject to a centralized testing and results process.

103. Rules apply to every thoroughbred racing participant and racetrack facility nationwide.

104. As the Authority itself admits, "the development of the Protocol is unprecedented." *Id.* at 5071; *see id.* at 5072 ("The Protocol and related rules will create a comprehensive program that is unprecedented in horseracing as previously conducted and regulated in the United States.").

105. Regulated parties must comply. The Authority can punish anyone who refuses to submit to warrantless testing and inspection. Under the Rules, "*[a]ll* Covered persons are *required* to comply with the Protocol and related rules, and to cooperate with the Authority and the Agency in relation to all aspects of doping and medication control, including sample collections, testing and investigation procedures." *Id.* at 5071 (emphasis added).

20

106.   The Authority's doping rules preempt state law. *Id.*

107.   The Protocol imposes vast *affirmative duties* on regulated parties. For example, covered people have the "personal responsibility . . . to ensure that treatments and medications administered to" their covered horses meet various requirements—including that they are "not administered in a manner detrimental or contrary to horse welfare" (as determined by the Authority). *Id.* at 5072.

108.   In fact, the Protocol says "it is the personal and non-delegable duty" of regulated parties to "ensure" that the Protocol is "complied with." *Id.*

109.   Covered parties—like Mr. Walmsley, Mr. Moss, and Iowa HBPA members here— must provide "full disclosure to regulatory authorities regarding the administration of medications and treatments to Covered Horses." *Id.* In other words, they must report *everything* that they *ever* give their horses. And if they do not, they face serious consequences.

110.   The Authority may also impose "substantial fines" after "elaborate hearing procedures" when it pleases. *Id.*

111.   The Protocol identifies banned substances and methods that "are prohibited at all times on the basis of the Agency's determination." *Id.* at 5074.

112.   The Authority tests horses even when horses are not in competition and the samples are kept by the Authority. *Id.*

113.   Horses must always be "made available" for testing "at *any time and any place* where they are located." *Id.* at 5094 (Rule 3040(b) (emphasis added)).

114.   On top of that, the Rules make it a "violation to evade" or to "refuse or fail to submit a Covered Horse for a sample collection." *Id.* at 5074.

21

115.    And violations are strict liability: "[P]resence and use violations are strict liability offenses for the Responsible Persons." *Id.*

116.    Covered parties also face hefty fines if they are complicit in a violation are temper in any doping control. *Id.*

117.    The Authority further prohibits "associating with a person who is banned," though the Authority does not define what "associating" means. *Id.* (citing Rule 3216).

118.    Testing is done by Authority-approved personnel (Rule 5450), using Authority-approved equipment (Rule 5320), in an Authority-approved environment (Rule 5310). *Id.* at 5079.

119.    The Rules also include a "list of civil sanctions for Anti-Doping Rule violations." *Id.* at 5074.

120.    In some instances, a person charged by the agency may also have to pay "some or all of the Agency's legal costs. (Rule 3223(b))." *Id.* at 5075.

121.    Disputes are heard either by the "Arbitral Body" or the "Internal Adjudication Panel," (IAP) depending on the alleged rule violation. The Arbitral Body hears disputes about anti-doping rules, while the IAP decides cases about the controlled mediation rule violation. *Id.* at 5081. Rules for these hearings are laid out in the Rule 7000 series.

122.    Both the Arbitral Body and the IAP have sweeping power and "may also adjudicate any other matter referred to it under the Protocol, and any other matter that *might arise* from time to time under the Protocol that the Agency considers should be determined by" the body. *Id.* at 5109, 5118 (emphasis added).

123.    "Arbitrators and IAP members may grant any remedy or relief authorized by the Act or the Rules issued pursuant to the Act." *Id.* at 5200 (quoting Rule 7350).

22

124.   Review of an Arbitral or IAP decision is subject to review by the FTC ALJ, as described in 15 U.S.C. § 3058.

### *The Horse Act Violates the Separation of Powers*

125.   "If the separation of powers meant anything to our framers, it meant that the three necessary ingredients to deprive a person of liberty or property—the power to make rules, to enforce them, and to judge their violations—could never fall into the same hands." *Tiger Lily, LLC v. HUD*, 5 F.4th 666, 673 (6th Cir. 2021) (Thapar, J., concurring); *see also PHH Corp v. CFPB*, 839 F.3d 1, 5 (D.C. Cir. 2016) (Kavanaugh, J.) ("When designing the executive power, the Framers first separated the executive power from the legislative and judicial powers.").

126.   The Horse Act runs roughshod over this constitutional structure by conferring all types of government power on the Authority and, nominally, the FTC: legislative, executive, and judicial.

127.   Start with Legislative Power. The Horse Act permits the Authority—with approval from the FTC—to issue binding rules that affect private parties and private rights. These regulations constitute legislative power. *See Gundy v. United States*, 139 S.Ct. 2116, 2133 (2019) (Gorsuch, J., dissenting) ("When it came to the legislative power, the framers understood it to mean the power to adopt generally applicable rules of conduct governing future actions by private persons—the power to 'prescrib[e] the rules by which the duties and rights of every citizen are to be regulated,' or the power to 'prescribe general rules for the government of society.'") (quoting *The Federalist*, No. 78 (Hamilton) and *Fletcher v. Peck*, 10 U.S. (6 Cranch) 87, 136 (1810)).

128.   As explained above, rules issued under the Horse Act require a "Covered Person" to pay yearly fees, register with the Authority, and open his books and records to the Authority's view.

23

129.     The regulations impose affirmative duties on private parties to monitor the whereabouts of their horses and immediately inform the Authority of developments that have nothing to do with horseracing (like castration).

130.     The rules establish racetrack safety standards, ban various substances in horseracing, limit what horseshoes can be used, regulate the number of whips jockeys can employ during a race, and much more.

131.     These rules bind private parties—they govern the rights and duties of anyone who owns a horse registered with a state or who is himself registered with a state.

132.     As a result, the Horse Act grants the Authority—along with the FTC—the power to exercise legislative power that the Constitution reserves to Congress. *See* U.S. CONST. art. I § 1 ("All legislative Power herein granted shall be vested in a Congress of the United States.").

133.     Turn to Executive Power. "Under the Constitution, the 'executive power'—all of it—is 'vested in a President' who must 'take Care that the Laws be faithfully executed." *Seila Law v. CFPB*, 140 S.Ct. 2183, 2191 (2020) (quoting U.S. CONST. art. II, § 1, cl. 1; § 3).

134.     But the President cannot do everything by himself, so he oversees subordinates who assist him in executing the laws. Such officers must be accountable to the President.

135.     The Authority enforces and executes the rules it creates.

136.     The Authority collects fees from horsemen who are "required to remit such fees to the Authority." 15 U.S.C. § 3052(f)(3)(C)(ii). And fees are used to fund the Authority's activities. *Id.* § 3052(f)(4).

137.     It can sue regulated parties through its in-house proceedings and in federal court. And "the power to seek daunting monetary penalties against private parties" is "a quintessentially executive power." *Seila Law*, 140 S.Ct. at 2200.

138.    End with Judicial Power. The Constitution vests "[t]he judicial Power of the United States . . . in one supreme Court, and in such inferior Courts as the Congress may from time to time ordain and establish." U.S. CONST. art. III, § 1.

139.    But the Authority has full control over picking the "judges" who adjudicate in-house proceedings. The Authority's adjudicators impose civil penalties and issue rulings that bind private parties in cases involving private rights. This constitutes an improper exercise of the judicial power. *See Plaut v. Spendthrift Farm, Inc.*, 514 U.S. 211, 218−19 (1995) ("The record of history shows that the Framers crafted this charter of the judicial department with an expressed understanding that it gives the Federal Judiciary the power, not merely to rule on cases, but to *decide* them, subject to review only by superior courts in the Article III hierarchy—with an understanding, in short, that 'a judgment conclusively resolves the case' because a 'judicial Power' is one to render dispositive judgements.") (quoting Frank H. Easterbrook, *Presidential Review*, 40 Case W. Rsrv. L. Rev. 905, 926 (1989)).

140.    The combination of these powers, Madison warned, is the very definition of tyranny. *The Federalist Papers: No. 47* (Madison) ("the accumulation of all powers legislative, executive, and judiciary in the same hands, whether of one, a few, or many, and whether hereditary, self appointed, or elective, may justly be pronounced the very definition of tyranny.").

141.    And by lodging all of government's power into a single, private, nonprofit corporation, Congress has outsourced power that the Constitution reserves to three distinct branches.

## COUNT I: THE AUTHORITY IS UNCONSTITUTIONALLY STRUCTURED

### (Violation of Article II, Section 1 and Section 2, Clause 2 of the U.S. Constitution (Appointments Clause and Vesting Clause))

25

142.    The Authority's structure violates the Constitution for at least two reasons: (1) its members are not properly appointed under the Appointments Clause, and (2) its members enjoy unconstitutional removal protections.

143.    Principal "Officers of the United States" must be appointed by the President "by and with the Advice and Consent of the Senate." U.S. CONST. art. II, § 2.

144.    But for inferior "Officers of the United States," "Congress may by Law vest the Appointment of such inferior Officers, as they think proper, in the President alone, in the Courts of Law, or in the Heads of Departments." U.S. CONST. art. II, § 2.

145.    Officials who wield significant government power are *at least* "inferior officers" under the Appointments Clause. *Lucia v. SEC*, 138 S.Ct. 2044, 2051 (2018).

146.    The Authority's Board of Directors exercise significant authority pursuant to the laws of the United States.

147.    The Authority's Board of Directors make important policy decisions, promulgate final binding rules, issue guidance, and direct an agency tasked with imposing civil fines and prosecuting actions in violation of regulations and laws.

148.    The Authority's Board of Directors hold continuing office established by law. 15 U.S.C. § 3052(b)(1).

149.    Members of the Authority's Board of Directors are Officers of the United States.

150.    The Authority's Board of Directors was not appointed by the President.

151.    The Authority's Board of Directors was not appointed by the Head of a Department.

152.    The Authority's Board of Directors was not appointed by a Court of Law.

153.   The Authority's Board of Directors is appointed by a nominating committee "comprised of seven independent members selected from business, sports, and academia." 15 U.S.C. § 3052(d)(1)(A)–(B).

154.   Members of the Authority's Board of Directors have been appointed in violation of the Appointments Clause.

155.   Rules issued by the Authority are void and as if they have not been made. The Authority—no less than any other member of the public—has no power to make and enforce such rules, and so the Federal Trade Commission has no such rules to approve.

156.   Relatedly, members of the Authority's Board of Directors are unconstitutionally insulated from removal from office.

157.   The President must have the "authority to remove those who assist him in carrying out his duties." *Seila Law*, 140 S.Ct. at 2191 (cleaned up).

158.   The Authority wields executive power.

159.   Members of the Authority's Board of Directors cannot be removed at all from office by the President.

160.   Members of the Authority's Board of Directors cannot be removed at all from office by the Federal Trade Commission.

161.   Members of the Authority's Board of Directors cannot be removed at all from office by anyone in the federal government.

162.   Members of the Authority's Board of Directors can be removed only by *unanimous* vote of all other members of the Board. 15 U.S.C. § 3052(b)(3)(C)–(D) (allowing Board to create bylaws that govern vacancies and term limits); *See* Bylaws, Section 3.3.

163.    FTC Commissioners are removable by the president only for "inefficiency, neglect of duty, or malfeasance in office." 15 U.S.C. § 41.

164.    "[D]ual for-cause limitations on the removal of" executive officers "contravene the Constitution's separation of powers." *Free Enter. Fund*, 561 U.S. at 492.

165.    By preventing the President from overseeing and superintending individuals wielding the executive power, the Horse Act violates Article II.

## COUNT II: THE HORSE ACT VIOLATES THE NONDELEGATION DOCTRINE

### (Private nondelegation: Article I, Section 1 of the U.S. Constitution)

166.    "All legislative powers herein granted shall be vested in a Congress of the United States." U.S. CONST. art. 1, § 1.

167.    Through the Horse Act, Congress delegated vast powers to a private corporation and the FTC to make binding legislative rules and regulations affecting private parties' private rights.

168.    Yet, the Supreme Court has explained that Congress cannot "delegate its legislative authority to trade or industrial associations or groups so as to empower them to enact the laws they deem to be wise and beneficent for the rehabilitation and expansion of their trade industries." *A.L.A. Schechter Poultry Corp. v. United States*, 295 U.S. 495, 537 (1935).

169.    Under the Act, the FTC must accept the rules—and thus policy decisions— proposed by the Authority so long as the Authority complied with procedural requirements of the Act. 15 U.S.C. § 3053(c)(2).

170.    The Horse Act also delegates vast executive power to a private corporation that enforces its own rules and regulations.

171.    The Horse Act allows the Authority to promulgate wide-ranging rules including that are legislative in nature because they govern general rules of behavior that bind private parties.

28

Indeed, the rules *must* be legislative since they preempt longstanding state law governing horseracing. 15 U.S.C. § 3054(b) ("The rules of the Authority . . . shall preempt any provision of State law or regulation.").

172.    The FTC has no power to reject Authority rules based simply on policy. *See* Anti-Doping Order at 1–2, n.2; *id.* at 4 ("[T]he Commission's statutory mandate to approve or disapprove a proposed Authority rule is limited to considering only whether the proposed rule is 'consistent with' the Act and the Commission's procedural rule.").

173.    Authority rules cannot exist unless and until the FTC itself has already approved them. So the FTC can exercise its power to change a rule only after it has already approved a rule. So even when the FTC disagrees with the policy of the Authority, it *must* approve whatever the Authority proposes—to later change it. *See id.* (explaining that the FTC can issue a rule modification "if the Commission concludes that the Authority's rule does not reflect the policies that the Commission believes would best to protect horseracing integrity or safety.").

174.    Any modification by the FTC must go through rulemaking procedures in accordance with 5 U.S.C. § 553. *See* 15 U.S.C. § 3053(e). Thus, the Authority's rules will have binding effect for a significant time even if the FTC later decides to change or abrogate a rule.

175.    Additionally, the Authority's rules are used to determine whether an "unfair or deceptive act or practice" has occurred in violation of the FTC Act, 15 U.S.C. § 45(a). Under the Horse Act, the sale of a covered horse can constitute an unfair or deceptive act or practice if "the horse has been administered . . . any other substance or method the *Authority determines* has a long-term degrading effect on the soundness of the covered horse." *Id.* § 3059(1)(B).

176.    And because the FTC enforces the FTC Act, the Authority's rules affect whether a separate agency may lawfully file suit against a person for sale of a covered horse. Thus, the

Authority's general rules of conduct clearly affect private parties exercising private rights—such as the buying and selling of private property.

177.    In fact, the Authority's rules may extend and bind private parties merely because a state racing commission or a breed organization requests as much. 15 U.S.C. § 3054(l).

178.    The Horse Act applies to Thoroughbreds, but a "state racing commission or breed governing organization . . . may elect to have such breed be covered by this chapter" by filing the proper paperwork. *Id.*

179.    The Authority may approve or reject any such request for the Horse Act to apply to non-Thoroughbred horses. *Id.*

180.    Thus, the Authority determines—in its sole discretion and with no governing principle laid down by Congress—whether other breeds of horses will be subject to binding legislative rules. *Id.* Congress has delegated completely the decision whether the Authority's rules will apply to horses other than Thoroughbreds.

181.    Finally, by statute, the Authority has "subpoena and investigatory authority with respect to civil violations committed under its jurisdiction." *Id.* § 3054(h). Neither the Commission nor any other government entity can revoke those powers.

## COUNT III: THE HORSE ACT VIOLATES THE NONDELEGATION DOCTRINE

### (Public nondelegation: Article I, Section 1 of the U.S. Constitution)

182.    Even if the Authority is a public entity subject to review by the FTC as to rules and regulations, the Horse Act violates the public nondelegation doctrine.

183.    When Congress delegates such vast legislative power, it must supply an "intelligible principle." *See Gundy*, 139 S.Ct. at 2123.

184.     No intelligible principle guides the FTC's decisions to "abrogate, add to, or modify" an existing rule from the Authority.

185.     Indeed, the FTC has no power to draft final rules and regulations. It can merely change the rules that the FTC already approved.

186.     Two provisions guide the FTC's oversight of the Authority's rules. First, under Section 3053(b) and (c), the Commission must approve the Authority's rule for it to take effect. And the FTC must approve any proposed Authority "rule or modification if the Commission finds that the proposed rule or modification is consistent with" the Horse Act and other rules approved by the Commission. 15 U.S.C. § 3053(c).

187.     After the Fifth Circuit Court of Appeals struck down the Horse Act as violating the private nondelegation doctrine, *see Black*, 53 F.4th at 869, Congress added another provision to the Horse Act.

188.     But nothing in the Act tells the FTC how to exercise discretion to add to or modify the Authority's rules. And the recent amendment to the Act simply tells the FTC to alter the Authority's rules—as it sees fit—and "in furtherance of *the purposes of this Act*." Yet, the Horse Act contains no general statements of purpose. And so the FTC must determine—for itself—what the purpose of the Act is. Nothing in the Horse Act provides the principle that the FTC should follow in making such a determination.

189.     Nor does the Horse Act inform the FTC when it would be "necessary or appropriate to ensure the fair administration of the Authority." The FTC must itself decide when it is "necessary or appropriate" to issue its own rules or change the Authority's rules.

190.     Indeed, the statute has no guidance on what constitutes the "fair administration of the Authority" or what is "in furtherance of the purposes of this Act."

31

191. In fact, the FTC's own order ratifying the Authority's prior rules made this clear. As the FTC explained, "the Commission now has a broader rulemaking power with respect to horseracing rules such that it can exercise its own policy choices *whenever it determines* that the Authority's proposals, *even if consistent with the Act*, are not the policies that the Commission thinks would be best for horseracing integrity or safety." *See* Fed. Trade Comm'n, *Order Ratifying Previous Commission Orders as to Horseracing Integrity and Safety Authority's Rules*, at 3, *available* *at*, https://www.ftc.gov/system/files/ftc_gov/pdf/HISA%20Order%20re%20Ratification%20of%20P revious%20Orders%20-%20Final%20not%20signed.pdf (emphasis added).

192. In other words, FTC Commissioners can change rules from the Authority *anytime* that it "*thinks would be best*." *Id.* (emphasis added).

193. The Horse Act does not allow the FTC to initiate final rulemaking at all. Under the Omnibus Bill Amendment, the FTC can only abrogate, modify, or change the rules issued by the Authority and previously approved by the FTC. Thus, the considerations in the Act that apply to the *Authority's* development of initial rules do not govern the FTC's ultimate approval or disapproval.

194. Because the FTC need not follow any standard, criteria, or principle in altering the Authority's rules, the Horse Act contains no intelligible principle and it violates the nondelegation doctrine.

195. Alternatively, the intelligible principle test should be overruled as inconsistent with the Constitution's text, history, and structure.

## COUNT IV: THE HORSE ACT AND THE AUTHORITY VIOLATE DUE PROCESS OF LAW

**(U.S. CONST. amend V)**

196.     The Horse Act also violates the due process of law.

197.     *First*, under the Horse Act, horseracing industry participants regulate their competitors.

198.     The Horse Act creates the Board of Directors of the Authority which includes four "industry" members who "shall be . . . selected from among the various equine constituencies." 15 U.S.C. § 3052(b)(1)(B)(i).

199.     The Authority's "Anti-Doping and Medication Control Standing Committee," which helps create anti-doping and medication-control rules includes "industry members selected to represent the various equine constituencies." 15 U.S.C. § 3052(c)(1)(B)(ii).

200.     The Authority's "Racetrack Safety Standing Committee" which helps create the racetrack safety program also includes multiple "industry members selected to represent the various equine constituencies." *Id.* § 3052(c)(2)(B)(ii).

201.     "Equine constituencies" includes "owners, breeders, trainers, racetracks, veterinarians, State racing commissions, and jockeys who are engaged in the care training or racing of covered horses." *Id.* § 3051(7).

202.     Further the Authority's "Nominating Committee" consists of seven "independent members selected from business, sports, and academia." *Id.* § 3052(d)(1)(A).

203.     The initial Nominating Committee members were picked by the "governing corporate documents of the Authority." *Id.* § 3052(d)(1)(B). Later vacancies are filled by the Board of Directors. *Id.* § 3052(d)(1)(C).

204.     The Nominating Committee also selected the initial members of the Board of Directors and the members of the Anti-Doping and Medication Control Committee and Racetrack Safety Committee. *Id.* § 3052(d)(3)(A).

33

205.    And the Nominating Committee recommends individuals to fill any vacancies on the Board of Directors or the standing committees going forward. *Id.* § 3052(d)(3)(B).

206.    The Due Process Clause of the Fifth Amendment prohibits "economically self-interested actor[s]" from "regulat[ing] its competitors." *Ass'n of Am. R.R.s v. Dep't of Transp.*, 821 F.3d 19, 23 (D.C. Cir. 2016).

207.    *Second*, the Authority is funded through fines it creates, enforces, and adjudicates—a clear violation of the due process clause.

208.    "Fees and fines imposed by the Authority shall be allocated toward funding of the Authority and its activities." 15 U.S.C. § 3052(f)(4).

209.    And the Authority collects such fines, in part, through its in-house adjudication scheme where the Authority picks the judge.

210.    The Authority thus (1) creates binding rules through regulation; (2) decides the fine to be levied when rule violations occur; (3) establishes and oversees the procedure and adjudication for determining whether a violation has occurred and whether a fine will be imposed; and (4) collects and uses the fines to fund its operations.

211.    Due process requires neutral application of the law and adjudications of whether rules have been violated. *Marshall v. Jerrico, Inc.*, 446 U.S. 238, 242 (1980).

212.    The Due Process Clause prohibits even an *appearance* of partiality in enforcement actions. *Caperton v. A.T. Massey Coal Co.*, 556 U.S. 868, 884–85 (2009); *see also Williams v. Pennsylvania*, 136 S.Ct. 1899, 1905 (2016).

213.    Indeed, "[j]ust as no man is allowed to be a judge in his own cause, similar fears of bias can arise when—without consent of other parties—*a man chooses the judge* in his own cause." *Caperton*, 556 U.S. at 886.

34

214.    The Authority—which enforces rule violations through its "Welfare Unit" known as the "Agency"—picks its own judges. The Authority's enforcement scheme creates *at least* an appearance of bias that violates the Due Process Clause, which requires impartial and neutral decision making. *Williams*, 136 S.Ct. at 1905.

215.    Adding to the problem, the Authority collects such fines and uses them for its own funding.

216.    But the Supreme Court has long held that government officials cannot oversee cases where they receive part of the fine that they levy. *Tumey v. Ohio*, 273 U.S. 510 (1927); *Ward v. Vill. of Monroeville*, 409 U.S. 57, 60 (1972).

217.    In short, the Horse Act permits the Authority to act as legislature, prosecutor, judge, and jury to collect fees that it will use for its own benefit—a clear violation of the Constitution's due process guarantees.

## COUNT V: THE AUTHORITY'S IN-HOUSE ADJUDICATION VIOLATES ARTICLE III, AND THE SEVENTH AMENDMENT

### (U.S. CONST. art. III; U.S. CONST. amend VII)

218.    The Constitution vests the "judicial Power of the United States in one supreme Court, and in such inferior Courts as the Congress may from time to time ordain and establish." U.S. CONST. art. III § 1.

219.    The Constitution does not vest the judicial power of the United States in the executive branch.

220.    The Authority cannot wield the "judicial Power" of the United States.

221.    Through its in-house adjudication scheme, the Authority imposes civil penalties for violations of a statute.

222.     Through its in-house adjudication scheme, the Authority issues binding judgments that require covered persons to pay fines and that ban covered persons from participating in horseracing.

223.     Covered persons under the Act have a private right to engage in a lawful business and a private right to keep their property—including their horses and money.

224.     The Authority's in-house adjudication scheme deprives covered persons of their private rights.

225.     Before depriving individuals of private rights, the Authority must follow common-law procedure—most fundamentally through an Article III court. *Stern v. Marshall*, 564 U.S. 462, 482–84 (2011).

226.     Only courts of law—vested with the "judicial Power of the United States"—may issue judgments depriving individuals of private rights and imposing legal remedies. *Plaut*, 514 U.S. at 219.

227.     The Arbitral Body and Internal Adjudication Panel adjudicate private rights.

228.     The Arbitral Body is not an Article III court or an Article III agency.

229.     The Internal Adjudication Panel is not an Article III court or an Article III agency.

230.     No Article III judge oversees hearings through the Arbitral Body or the Internal Adjudication Panel.

231.     The Authority's in-house adjudication structure violates Article III.

232.     Relatedly, the Seventh Amendment to the Constitution provides: "In Suits at common law, where the value in controversy shall exceed twenty dollars, the right of trial by jury shall be preserved." U.S. CONST. amend. VII.

233.    Claims analogous to common-law claims that existed at the time of the Seventh Amendment's ratification require a jury. *Curtis v. Loether*, 415 U.S. 189, 194 (1974).

234.    And claims in federal court that seek legal remedies such as civil penalties require a jury. *Tull v. United States*, 481 U.S. 412, 418–22 (1987).

235.    The Horse Act empowers the Authority and its "Agency" (the "Welfare Unit") to seek and collect civil penalties and fines through in-house proceedings, which violates the Seventh Amendment.

236.    The Horse Act's enforcement scheme imposes legal damages without a jury.

237.    Regulated parties must endure the Horse Act's in-house adjudication scheme that does not provide a jury.

## PRAYER FOR RELIEF

Wherefore, Plaintiffs pray for relief as follows:

1.  A judgment declaring under 28 U.S.C. § 2201 and Fed. R. Civ. P. 57 that the Horse Act violates the Constitution and/or is otherwise unlawful;

2.  An injunction prohibiting Defendants from enforcing the Anti-Doping and Medication Control Rules;

3.  An injunction prohibiting Defendants from enforcing the Horse Act and all rules issued under the Horse Act;

4.  An order setting aside and vacating all Rules issued under the Horse Act under 5 U.S.C. § 706;

5.  An award of nominal damages to Plaintiffs;

6.  An award of reasonable attorney fees and costs, pursuant to 28 U.S.C. § 2412 or any other applicable authority; and

7.  Any other relief the Court deems just and proper.

DATED: April 6, 2023.

Respectfully submitted,

BRETT D. WATSON
ABN #2002182
Brett D. Watson, Attorney at Law, PLLC
P.O Box 707
Searcy, Arkansas 72145
Telephone: (501) 281-2468
watson@bdwpllc.com

JOHN KERKHOFF*
Ohio Bar: 0097134
3100 Clarendon Blvd.
Suite 1000
Arlington, Virginia 22201
Telephone: (916) 309-6930
JKerkhoff@pacificlegal.org

CALEB KRUCKENBERG*
D.C. Bar No. 1617890
3100 Clarendon Blvd.
Suite 1000
Arlington, Virginia 22201
Telephone: (202)888-6881
CKruckenberg@pacificlegal.org

*Attorneys for Plaintiffs*
*\*Pro Hac Vice applications forthcoming*

38